Christopher Kim (Bar No. 082080)
George Busu (Bar No. 235993)
**LIM RUGER & KIM, LLP**
1055 West Seventh Street, Suite 2800
Los Angeles, California 90017
Telephone: (213) 955-9500
Facsimile: (213) 955-9511
email: christopher.kim@lrklawyers.com
        george.busu@lrklawyers.com

*Add'l counsel listed on signature page*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

SACV08-787 DOC MLGx

| | |
|---|---|
| SYMONE LEYVAS, JOHN LEYVAS and JUNE HARDING BROWN, on behalf of themselves and all others similarly situated, | No. _____ |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **[JURY TRIAL DEMANDED]** |
| v. | |
| BANK OF AMERICA CORP., COUNTRYWIDE FINANCIAL CORP., COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE BANK, FSB, FULL SPECTRUM LENDING, INC. and DOES 1-10 inclusive, | |
| Defendants. | |

Plaintiffs Symone Leyvas, John Leyvas and June Harding Brown ("Plaintiffs"), on behalf of themselves and a class of all others similarly situated, allege as follows:

## INTRODUCTION

1.     Defendants Countrywide Financial Corp., Countrywide Bank, FSB, Full Spectrum Lending, Inc. and Bank of America Corp. (collectively "Countrywide") are home mortgage lenders who have engaged in unfair competition and false advertising in the origination of residential mortgage loans and home equity lines of credit ("HELOCs").

2.     Home ownership is a key component of the American dream. Capitalizing on this, Countrywide has routinely and consistently employed deceptive marketing practices and steered consumers into risky and costly home loans.

3.     As a result, many consumers are now suffering under the immense weight of unsuitable, over-priced mortgage loans.

4.     This is a proposed national class action brought by Plaintiffs on behalf of themselves and a class of all other similarly situated borrowers who have suffered from Countrywide's deceptive, unfair and unlawful business practices.

5.     Plaintiffs seek both monetary and injunctive relief for themselves and all other members of the Class.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d) because this is a Class action in which: (1) there are 100 or more members in the proposed Class; (2) many Plaintiffs and Class members have a different citizenship from the Defendants; and (3) the claims of the proposed Class members exceed $5,000,000 in the aggregate.

CLASS ACTION COMPLAINT

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

**Plaintiffs**

Symone and John Leyvas

8.     Plaintiffs Symone and John Leyvas ("Mr. and Mrs. Leyvas") has been harmed by Defendants' unlawful conduct. Mr. and Mrs. Leyvas obtained a home loan from Countrywide on or about August 31, 2007.

9.     In July of 2007, Mr. and Mrs. Leyvas began looking to refinance their then-existing mortgage, seeking to lower their debts and lower their existing interest rate (about 9%) and get $15,000 cash out.

10.     Mr. and Mrs. Leyvas were told by their broker that Countrywide would provide them with a 30-year fixed rate loan, with an interest rate between 7% and 8.5%.

11.     At closing, Mr. and Mrs. Leyvas were confused and surprised by their loan terms. First, the amount of the cash-out that they had been promised had been lowered. Second, they were presented with conflicting amortization schedules—both for 40-year terms and depicting different amounts. Third, they learned that the loan was actually a hybrid ARM with an initial rate of 10.25%. Fourth, there were several copies of disclosure statements representing different interest rates, closing costs, etc.

12.     At the closing, Mr. and Mrs. Leyvas were instructed to sign multiple copies of the same disclosure documents, indicating different terms and different dates. At closing, upon information and belief, Mr. and Mrs. Leyvas were instructed to backdate certain disclosure documents with respect to their loan. For example, some of their disclosure documents indicate that they were prepared on

computer-generated date of August 15, 2007, yet were signed and "dated" August 13, 2007.

13.    They did not receive copies of all of the signed documents.

14.    Further, according to Mr. and Mrs. Leyvas, their income had been falsified.

15.    Countrywide paid Mr. and Mrs. Leyvas' broker a fee of $5,130.00 (the broker had already charged them a $645 "application fee").

16.    Recently, Mr. and Mrs. Leyvas have been contacted by Countrywide on numerous occasions, with generalized solicitations to refinance with Countrywide and, essentially, reward the Company with additional revenue. As Countrywide knows, Mr. and Mrs. Leyvas' loan is saddled with a prepayment penalty, increasing their costs of refinancing within the first three years following closing.

17.    Mr. and Mrs. Leyvas have been harmed by the conduct alleged herein and seek redress for themselves and the members of the proposed Class.

June Harding Brown

18.    Plaintiff June Harding Brown ("Brown") has also been harmed by Defendants' unlawful conduct. Plaintiff Brown, a senior citizen, obtained a home loan from Countrywide on or about August 17, 2007, secured by her residence located at 7913 Pompey Place, Philadelphia, PA.

19.    At the time of her loan, Plaintiff Brown had a good credit score, but was on a fixed income. Accordingly, she was seeking to lower her monthly payments.

20.    According to Plaintiff Brown, the broker with whom she dealt promised to save her money. However, following the closing, she was surprised to find that, if she made only the payment that she was promised would save her money, she would suffer negative amortization. Thus, Plaintiff Brown suddenly

1    found herself having to *increase* her monthly payment in order to avoid negative
2    amortization.

3         21.    Plaintiff Brown was placed into a pay option ARM, one of the most
4    risky, harmful loans that Countrywide offered. Under the terms of her loan, she
5    has four options each month, with respect to her payment, one of which is to make
6    a minimum monthly payment calculated according to a rate significantly lower
7    than the actual loan rate. According to Plaintiff Brown, prior to closing, no one
8    explained to her that this would cause negative amortization. However, paying
9    only the "minimum payment"—used to lure her into the loan—would cause
10   Plaintiff Brown to owe approximately $14,000 more than she borrowed, after five
11   years.

12        22.    According to Plaintiff Brown, when she questioned the possible
13   increase in her payment, her broker told her "not to worry about it" and that she
14   should focus only upon the minimum monthly payment. Subsequent to closing,
15   once she discovered the negative amortization feature, Plaintiff Brown called
16   Countrywide to complain about her loan. The representative with whom she spoke
17   admitted that she should never have been placed into this loan product, and
18   informed her that she must pay a higher amount each month, based upon a 30-yr
19   amortization schedule and including both principal and interest, in order to avoid
20   negative amortization.

21        23.    To make matters worse, Plaintiff Brown did not even receive a low
22   initial rate for her pay option ARM. Plaintiff Brown's initial interest rate under her
23   pay option ARM was 9.750%--higher than the rate of the prior loan that she was
24   refinancing. Outside of closing, Countrywide paid Plaintiff Brown's broker a yield
25   spread premium of $3,240.00.

26

27

28

24.     Recently, Plaintiff Brown has been contacted by Countrywide on numerous occasions, with generalized solicitations to refinance with Countrywide and, essentially, reward the Company with additional revenue.

25.     As Countrywide knows, Plaintiff Brown's loan is saddled with a prepayment penalty, increasing her costs of refinancing within the first three years following closing.

26.     Plaintiff Brown has been harmed by the conduct alleged herein and seeks redress for herself and the members of the proposed Class.

**Defendants**

27.     Defendant Bank of America Corp. is a Delaware corporation, with its corporate headquarters located in Charlotte, North Carolina.  On July 1, 2008, Bank of America Corp. acquired Countrywide and, accordingly, is Countrywide's successor-in-interest.

28.     Prior to the merger with Bank of America Corp., Defendant Countrywide Financial Corp. was a publicly traded corporation, duly formed and existing under the laws of the State of Delaware. Countrywide's corporate headquarters is located in Calabasas, California.

29.     During the Class Period, Defendant Countrywide Home Loans, Inc. was Countrywide's flagship subsidiary and provided home loans nationwide. Countrywide Home Loans is a New York corporation with its corporate headquarters in Calabasas, California.

30.     Defendant Countrywide Bank, FSB ("Countrywide Bank") is a federally chartered savings bank, headquartered in Thousand Oaks, California. Countrywide Bank funds loans originated by the Company's home loan division.

31.     Defendant Full Spectrum Lending, Inc. ("Full Spectrum"), a division of Countrywide, originated subprime mortgage loans during the relevant time period.  Full Spectrum is headquartered in Calabasas, California.

CLASS ACTION COMPLAINT

32.   At all times herein mentioned, Defendants, both individually and collectively, including affiliates not herein named, are and were agents or joint venturers of each of the other Defendants, and in doing the acts alleged herein were acting within the course and scope of such agency.  Each Defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced in, and/or authorized the wrongful acts of each co-Defendant, and/or retained the benefits of said wrongful acts.

33.   The actions of each of the Defendants were controlled by, *inter alia*, a program of centralized policy-making, policy software, dissemination, and training, as well as the implementation of centralized decision-making and policy control by and through Countrywide's overlapping officers/corporate-subsidiary oversight and/or by a process of policy dissemination.

### CLASS ACTION ALLEGATIONS

34.   Plaintiffs bring this action on their own behalf and, pursuant to the provisions of Fed. R. Civ. P. 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of a nationwide class of all others similarly situated (the "Class"), defined as:

> All persons in the United States who, at any time between July 17, 2004 and July 1, 2008[1], obtained at least one residential mortgage loan from Countrywide and were subject to any of the unlawful lending practices described herein, including unfair, misleading and/or deceptive solicitation practices, excessive fees, unfair, abusive or undisclosed loan terms and deceptive steering.

---

[1] Defendant Bank of America Corp. has stated that, following its July 1, 2008 acquisition of Countrywide, it will discontinue many of Countrywide's predatory lending practices. *See e.g.* *http://newsroom.bankofamerica.com/index.php?s=press_releases&item=8202*

35.   Such practices include any representations, misrepresentations, omissions, disclosures or any other acts, events, facts, transactions, occurrences, or conduct, whether oral, written or otherwise, by Countrywide, including its employees or agents, arising out of, or relating to any of the following:

(a)   loan types and terms;

(b)   interest rates;

(c)   disclosures, including both oral and written disclosures; prepayment penalties; and

(d)   material changes in terms that have the effect of increasing the payment obligations of the borrower.

36.   The members of the Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable. While the exact number of Class members is unknown to the Plaintiffs at this time, Plaintiffs believe that there are at least tens of thousands of Class members. Detailed information on the Class can be ascertained through appropriate discovery and from records maintained by Countrywide.

37.   Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and all other members of the Class sustained damages arising out of the same pattern of wrongful conduct by Countrywide. All of the conduct alleged herein occurred by virtue of the Company's centralized business practices or stemmed from policies and procedures that originated from and/or were controlled by Countrywide.

38.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and have retained counsel competent and experienced in Class action and consumer litigation.

39.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual class members.  Among these common questions of law and fact common are:

    (a)   Whether Countrywide has been or is engaged in a false, misleading and/or deceptive marketing practices;

    (b)   Whether Countrywide has steered borrowers toward unsuitable, over-priced and risky loan products, including pay option ARMs and hybrid ARMs;

    (c)   Whether Countrywide has incentivized and/or encouraged its employees and brokers to increase loan volume, regardless of the borrowers' ability to pay;

    (d)   Whether Countrywide's solicitations were unfair, misleading, unconscionable, deceptive, untrue, misleading, or omitted material facts and disclosures;

    (e)   Whether Countrywide has been or is engaged in unfair and unlawful business practices, and whether the alleged conduct violated the California Business and Professions Code and the California Consumer Legal Remedies Act; and

    (f)   Whether the Plaintiffs and the Class are entitled to relief, and if so, the measure of such relief.

40.     A class action is superior to other available methods for the fair and efficient adjudication of Countrywide's uniform unlawful practices because joinder of all members is impracticable.  Prosecution of separate actions by individual Class members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Countrywide.

41.   In addition, due to the vastly unequal market power between the parties, and the fact that many Class members are in ongoing commercial relationships with Countrywide, a Class action may be the only way, as a practical matter, that the cases can and should be prosecuted.   Plaintiffs foresee no significant difficulties in managing this action as a Class action.

## FACTUAL ALLEGATIONS

### I.   Countrywide's Mortgage Lending Operations

42.   On July 1, 2008, Countrywide was acquired by Bank of America Corp.

43.   Prior to July 1, 2008, Countrywide was one of the nation's largest residential mortgage lenders, with over hundreds of billions of dollars in loan production each year and a residential mortgage servicing portfolio in excess of $1 trillion.  Its mortgage lending segment operated in a variety of sectors, including retail, wholesale and correspondent lending.

44.   In addition to over 15,000 field salespersons pursuing customer leads and originating home loans, Countrywide sourced loans through a network of over 30,000 mortgage brokers.

45.   According to its 2007 Form 10-K annual report, Countrywide's retail channel consisted of its Consumer Markets Division and the Full Spectrum Lending Division.  The Company's Consumer Markets Division CMD generally originated loans through relationships with existing consumers, builders and realtors and through the Company's joint ventures.   The Company reached customers through call centers, the internet, retail branches,

46.   The Company's Full Spectrum Lending Division focused on new customer acquisitions through internet, direct mail and mass media marketing channels and specialized in refinance and home equity products.

47.     Countrywide's wholesale lending channel underwrote and funded mortgage loans sourced by mortgage loan brokers and other financial intermediaries.

## II.     Countrywide's Sole Concern Was With Increasing its Volume of Loans – at any Cost

48.     Countrywide sold the majority of its mortgage loans into the secondary market, in the form of securities.

49.     With mortgage-backed securities, essentially, mortgage loans are purchased from banks, mortgage companies, and other originators and then assembled into pools and transferred to a trust controlled by the securitizer, such as Countrywide.   The entity then issues securities that represent claims on the principal and interest payments made by borrowers on the loans in the pool, a process known as securitization.   Holders of the securities received the right to a portion of the monthly payment stream from the pooled loans, typically in the form of a portion of the monthly payments.   Rather, the holders received some portion of the monthly payments.

50.     For the sale of whole (*i.e.*, unsecuritized) loans, Countrywide pooled loans and sold them in bulk to third-party investors, often (but not exclusively) Wall Street firms.   The sale of whole loans generated additional revenues for Countrywide.   Countrywide often sold the whole loans at a premium, meaning that the purchaser paid Countrywide a price in excess of 100% of the total principal amount of the loans included in the loan pool.

51.     As the State of the California noted, the price paid by purchasers of securities or pools of whole loans varied based on the demand for the particular types of loans included in the securitization or sale of whole loans.   The characteristics of the loans, such as whether the loans are prime or subprime,

CLASS ACTION COMPLAINT

1   whether the loans have an adjustable or fixed interest rate, or whether the loans

2   include a prepayment penalty, all influenced the price.

3        52.    Further, various types of loans and loan terms earned greater prices, or

4   "premiums," in the secondary market.  For instance, investors in mortgages and

5   mortgage-backed securities have been willing to pay higher premiums for loans

6   with prepayment penalties.   Essentially, prepayment penalties are designed to

7   deter borrowers from refinancing early in the life of a loan.   Thus, prepayment

8   penalties provide investors with assurance that the income stream from the loans

9   will likely continue while the penalty is in effect.  Countrywide typically sought

10  to market to its customers loans that earned it higher premiums, including loans

11  with prepayment penalties.

12       53.    In order to maximize the profits earned by the sale of its loans to the

13  secondary market, Countrywide's business model increasingly focused on finding

14  ways to generate an ever larger volume of the types of loans most demanded by

15  investors.  For example, Countrywide developed and modified loan products by

16  discussing with investors the prices they would be willing to pay for loans with

17  particular characteristics (or for securities backed by loans with particular

18  characteristics), and this enabled Countrywide to determine which loans were

19  most likely to be sold on the secondary market for the highest premiums.

20       54.    The California investigation also showed that, rather than waiting to

21  sell loans until after they were made, Countrywide would sell loans "forward"

22  before loans were funded.  In order to determine what loans it could sell forward,

23  Countrywide would both examine loans in various stages of production and

24  examine its projected volume of production over the next several months.

25       55.    Loans that were sold forward were sold subject to a set of stipulations

26  between Countrywide and the purchaser.  For example, in a sale of whole loans,

27  Countrywide might agree on October 1 that on December 1 it would deliver 2000

28

adjustable rate mortgage loans with an average interest rate of 6.0%, half of which would be subject to a prepayment penalty, among other characteristics. (None of these loans would have been made as of October 1.) Based on these stipulations regarding the characteristics of the loans to be included in the pool, an investor might agree to pay a price totaling 102.25% of the total face value of the loans. In other words, the purchaser agreed in advance to pay a premium of 2.25%. Then, if the loans actually delivered on December 1 had a slightly higher or lower average interest rate, the terms of the stipulation would specify how much the final price would be adjusted.

56.    Information regarding the premiums that particular loan products and terms could earn on the secondary market would be forwarded to Countrywide's production department.

57.    Countrywide then directly and indirectly motivated its branch managers, loan officers and brokers to market the loans that would earn the highest premiums on the secondary market without regard to borrower ability to repay. For example, the value on the secondary market of the loans generated by a Countrywide branch was an important factor in determining the branch's profitability and, in turn, branch manager compensation. Managers were highly motivated to pressure their loan officers to sell loans that would earn Countrywide the highest premium on the secondary market, which resulted in aggressive marketing of such loans to consumers.

58.    Essentially, as investors' interest in the mortgage market increased, Countrywide had an increased incentive to increase its volume of loans. To increase its pipeline of mortgage-backed securities, the Company had a huge financial incentive to lower its underwriting standards and make more risky loans.

59.    In 2004, in an effort to maximize Countrywide's profits, Defendants set out to double Countrywide's share of the national mortgage market to 30%

1   through a deceptive scheme to mass produce loans for sale on the secondary

2   market. Defendants viewed borrowers as nothing more than the means for

3   producing more loans, originating loans with little or no regard to borrowers'

4   long-term ability to afford them and to sustain homeownership.

5       60.   Countrywide generated massive revenues through these loan

6   securitizations. Its reported securities trading volume grew from $647 billion in

7   2000 to $3.8 trillion in 2006.

8       61.   In its 2006 annual report, Countrywide boasted: "[w]hile the overall

9   residential loan production market in the United States has tripled in size since

10  2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown

11  nearly three times faster, going from $62 billion in loan originations in 2000 to

12  $463 billion in 2006."

13      62.   Countrywide became less concerned with borrowers' ability to repay

14  over the long term and more concerned with its mere volume of loans over the

15  short term. This is because the Company's profits largely depended on the

16  quantity, rather than the quality of loans that they closed. As a result, many loans

17  were made to borrowers that exceeded the borrowers' ability to repay.

18      63.   Countrywide's insatiable lust for increased loan volume was also

19  driven by a desire to boost its profits earned from servicing the mortgages it sold.

20  Countrywide often retained the right to service the loans it securitized and sold as

21  pools of whole loans. The terms of the securitizations and sales agreements for

22  pools of whole loans authorized Countrywide to charge the purchasers a monthly

23  fee for servicing the loans, typically a percentage of the payment stream on the

24  loan.

25      64.   Essentially, Countrywide did everything within its power to simply

26  close as many loans as possible, so as to sell them into the secondary market. The

27  results for consumers have been catastrophic.

28

CLASS ACTION COMPLAINT

### III. Countrywide Engaged in Unfair and Deceptive Practices in Selling Risky, Unsuitable Mortgage Loans to its Customers

65.    One of the largest players in the subprime mortgage lending market, Countrywide engaged in uniform unfair, unconscionable, deceptive and unlawful commercial practices in soliciting and closing residential mortgage transactions nationwide.

66.    Rather than serve the best interests of its customers, Countrywide engaged in numerous predatory lending practices that have harmed hundreds of thousands of homeowners across the United States.

67.    As recently described in a lawsuit against Countrywide filed by the State of California, Countrywide implemented this deceptive scheme through misleading marketing practices designed to sell risky and costly loans to homeowners, the terms and dangers of which they did not understand, including by (a) advertising that it was the nation's largest lender and could be trusted by consumers; (b) encouraging borrowers to refinance or obtain purchase money financing with complicated mortgage instruments like hybrid adjustable rate mortgages or payment option adjustable rate mortgages that were difficult for consumers to understand; (c) marketing these complex loan products to consumers by emphasizing the very low initial "teaser" or "fixed" rates while obfuscating or misrepresenting the later steep monthly payments and interest rate increases or risk of negative amortization; and (d) routinely soliciting borrowers to refinance only a few months after Countywide or the loan brokers with whom it had "business partnerships" had sold them loans.

68.    Countrywide also employed various lending policies to further its deceptive scheme and to boost its volume of loans, including (a) significantly easing its underwriting standards; (b) increasing its use of low- or no-documentation loans—including allowing for no verification of stated income or

stated assets or both, or no request for income or asset information at all; (c) encouraging borrowers to encumber their homes up to 100% (or more) of the assessed value; and (d) placing borrowers in "piggyback" second mortgages in the form of higher interest rate HELOCs, while obscuring their total monthly payment obligations.

69.    The State of California's investigation revealed that Countrywide received numerous complaints from borrowers claiming that they did not understand their loan terms.   However, despite these complaints, Defendants turned a blind eye to the ongoing deceptive practices engaged in by Countrywide's loan officers and loan broker "business partners," as well as to the hardships created for borrowers by its loose underwriting practices.  As described above, Countrywide cared only about selling increasing numbers of loans at any cost, in order to maximize its profits on the secondary market.

70.    Countrywide's tactics included the deceptive marketing of such products as the pay option ARM.  The pay option ARM is a complicated mortgage product which entices consumers by offering a very low "teaser" rate – often as low as 1% – for an introductory period of one or three months.  At the end of the introductory period, the interest rate increases dramatically.

71.    Further, despite the short duration of the low initial interest rate, Countrywide's pay option ARMs often included a one, two or three-year prepayment penalty.  As a result, the borrower was basically stuck in the loan—he or she could not, without penalty, refinance into a better, less expensive loan before expiration of the initial low interest rate period.

72.    When the teaser rate on a pay option ARM expires, the loan immediately becomes an adjustable rate loan. Unlike most adjustable rate loans, where the rate can only change once every year or every six months, the interest

1  rate on a pay option ARM can change every month (if there is a change in the
2  index used to compute the rate).

3      73.    Although the interest rate increases immediately after the expiration
4  of the short period of time during which the teaser rate is in effect, a borrower with
5  a pay option ARM has the option of making monthly payments as though the
6  interest rate had not changed.  Borrowers with pay option ARMs typically have
7  four different payment options during the first five years of the loan.  The first
8  option is a "minimum" payment that is based on the introductory interest rate.  The
9  minimum payment, which Countrywide marketed as the "payment rate," is the
10  lowest of the payment options presented to the borrower.  As Countrywide
11  undoubtedly knew, most of its pay option ARM borrowers chose to make the
12  minimum payment.

13      74.    The minimum payment on a pay option ARM usually is less than the
14  interest accruing on the loan.  The unpaid interest is added to the principal amount
15  of the loan, resulting in negative amortization.  The minimum payment remains
16  the same for one year and then increases by 7.5% each year for the next four
17  years.  At the fifth year, the payment will be "recast" to be fully amortizing,
18  causing a substantial jump in the payment amount often called "payment shock."

19      75.    However, the loan balance on a pay option ARM also has a negative
20  amortization cap, typically 115% of the original principal of the loan.  If the
21  balance hits the cap, the monthly payment is immediately raised to the fully
22  amortizing level (i.e., all payments after the date the cap is reached must be
23  sufficient to pay off the new balance over the remaining life of the loan).  When
24  that happens, the borrower experiences significant payment shock.  A borrower
25  with a Countrywide pay option ARM with a 1% teaser rate, who is making the
26  minimum payment, is very likely to hit the negative amortization cap and suffer
27  payment shock well before the standard 5-year recast date.

28

76. Instead of making the minimum payment, the borrower also has the option of making an interest-only payment for five years. The borrower then experiences payment shock when the payment recasts to cover both principal and interest for the remaining term of the loan. Alternatively, the borrower can choose to make a fully amortizing principal and interest payment based on either a 15-year or a 30-year term.

77. Products such as Countrywide's pay option ARM are among the most troublesome mortgage products in the market. For example:

> For some borrowers, option ARMs are ticking time bombs. The loans are tempting because they give borrowers several payment choices each month, including a minimum payment that lets them pay no principal and only part of the interest normally due. When borrowers choose that option, the loan balance expands -- a phenomenon known in the mortgage trade as "negative amortization."
>
> After a specified period, often five years, borrowers must start repaying the principal and meeting the full interest payments. That can cause monthly payments to more than double. If the balance outstanding gets too high -- the ceiling generally is 110% to 125% of the original amount borrowed -- borrowers can face sharply higher payments even sooner.

James Hagerty and Ruth Simon, *Option ARMs Emerge as Home-Loan Worry*, The Wall Street Journal (April 19, 2007), *available at:* http://www.realestatejournal.com/buysell/mortgages/20070419-hagerty.html (accessed July 10, 2008).

CLASS ACTION COMPLAINT

78.  Pay option ARM mortgages are extremely problematic and have notoriously led to increased mortgage loan defaults among borrowers. *See e.g.* Kathleen Pender, *Hazards of Option ARMs*, San Francisco Chronicle, p. D-1 (June 1, 2005).

79.   During the underwriting process, Countrywide did not consider whether borrowers would be able to afford the payment shock the Company knew was almost certain to occur.  Further, depending on the state of his or her finances, even the interim increases in the minimum payment may well have caused dramatic hardship for the borrower.

80.   The State of California's investigation revealed that, as of December 31, 2006, almost 88% of Countrywide's pay option ARM portfolio consisted of loans that had experienced some negative amortization.   This percentage increased to 91% as of December 31, 2007.

81.   Without regard for borrowers' ability to repay, Countrywide sold thousands of pay option ARMs, either through its branches or through brokers. For example, on a national basis, approximately 19% of the loans originated by Countrywide in 2005 were pay option ARMs.

82.   While devastating to borrowers, these loans were highly profitable for Countrywide.  The Company had a gross profit margin of approximately 4% on pay option ARMs, compared to 2% on mortgages guaranteed by the Federal Housing Administration.

83.   Further, Countrywide retained ownership of a number of loans for investment purposes, including thousands of pay option ARMs.   Countrywide reported the negative amortization amounts on these pay option ARMs (i.e., the amount by which the balances on those loans increased) as income on its financial statements.  The negative amortization "income" earned by Countrywide totaled $1.2 billion by the end of 2007.

84.     Additionally, as the California attorney general noted, pay option ARMs with higher margins could be sold for a higher premium on the secondary market, because the higher margins would produce a greater interest rate and, therefore, a larger income stream for investors. Thus, to insure an abundant stream of such loans, Countrywide pushed its loan officers to sell pay option ARMs and paid loan brokers greater compensation for selling a pay option ARM with a higher margin, or above-par rate, thus encouraging them to put consumers into higher cost loans. Countrywide also used a variety of deceptive marketing techniques to sell its pay option ARMs to consumers.

85.     Countrywide deceptively marketed the pay option ARM by aggressively promoting the teaser rate. Television commercials emphasized that the payment rate could be as low as 1% and print advertisements lauded the extra cash available to borrowers because of the low minimum payment on the loan. Television advertisements did not effectively distinguish between the "payment rate" and the interest rate on the loans, and any warnings about potential negative amortization in Countrywide's print advertisements were buried in densely written small type.

86.     Further, Countrywide marketed the pay option ARM to already-distressed borrowers seeking to lower their monthly mortgage payments. Rather than adequately explain the certain negative amortization and payment shock, Countrywide would focus the borrowers' attention on the low minimum payment.

87.     Borrowers, then, enticed by the low teaser rate, were easily distracted from the fine print in the loan documents and did not fully understand the terms or the financial implications of Countrywide's pay option ARMs. Countrywide used this to its advantage.

88.     When a borrower obtained a pay option ARM from Countrywide, the only initial monthly payment amount that appeared anywhere in his or her loan

documents was the minimum payment amount.    In other words, documents provided to the borrower assumed he or she would make only the minimum payment.  Thus, a borrower would not know the monthly payment necessary to make a payment that would, for example, cover accruing interest, until he or she received the first statement after the expiration of the teaser rate, well after all loan documents were signed.

89.    Countrywide and the brokers it accepted as its "business partners" misrepresented or obfuscated the true terms of the pay option ARMs offered by Countrywide, including, but not limited to, misrepresenting or obfuscating the amount of time that the interest rate would be fixed for the loan, misrepresenting or obfuscating the risk of negative amortization and the fact that the payment rate was not the interest rate, and misrepresenting or obfuscating that the minimum payment would not apply for the life of the loan.

90.    Countrywide and its business partner brokers also misrepresented or obfuscated how difficult it might be for borrowers to refinance a pay option ARM loan.  In fact, after making only the minimum payment, because of negative amortization, the borrower likely would not be able to refinance a pay option ARM loan unless the home serving as security for the mortgage had increased in value.  This is particularly true in cases for borrowers whose loans have a very high loan-to-value ratio.

91.    As a result, the borrower is often stuck in the loan—unable to sell and unable to refinance.

92.    Countrywide and its business partner brokers often misrepresented or obfuscated the fact that a particular pay option ARM included a prepayment penalty and failed to explain the effect that making only the minimum payment would have on the amount of the prepayment penalty.  If a borrower seeks to refinance after having made the minimum payment for an extended period, but

1   while a prepayment penalty is still in effect, the negative amortization can cause

2   the amount of the prepayment penalty to increase.  Prepayment penalties typically

3   equal six months worth of accrued interest.  As negative amortization causes

4   the loan principal to increase, it also causes an increase in the amount of interest

5   that accrues that each month, thereby increasing the prepayment penalty.

6        93.    The State of California's investigation found that Countrywide and its

7   business partner brokers also represented that the prepayment penalty could be

8   waived if the borrower refinanced with Countrywide.  This was often false,

9   however, because Countrywide sells most of the loans it originates and has, at

10  most, limited authority to waive prepayment penalties on loans it does not own,

11  even when it controls the servicing.

12       94.    In addition to pay option ARMs, Countrywide deceptively marketed

13  hybrid ARM loans.  A hybrid ARM loan has a fixed interest rate for an initial

14  period of 2, 3, 5, 7, or 10 years, and then an adjustable interest rate for the

15  remaining loan term.

16       95.    Countrywide offered a variety of such loans, including:

17       (a)    2/28 ARMs—low, fixed rate for first two years; adjustable rate for

18              next 28 years;

19       (b)    3/27 ARMs—low fixed rate for first three years; adjustable rate for

20              next 27 years;

21       (c)    5/1, 7/1 and 10/1 ARMs—low, fixed rate for first five, seven or ten

22              years, respectively; thereafter, adjustable rate determined by adding

23              a margin to an index;

24       96.    Following the expiration of their initial fixed rates, borrowers with

25  hybrid ARMs often experience payment shock similar to borrowers with pay

26  option ARMs.

27

28

97.   Countrywide underwrote 2/28 and 3/27 ARMs based on the payment required while the initial rate was in effect, without regard to whether the borrower could afford the loan thereafter.   And, like pay option ARMs, Countrywide's 2/28 and 3/27 ARMs typically contained prepayment penalties.

98.   Countrywide's 5/1, 7/1 and 10/1 ARMs were marketed as having initial interest-only periods and, upon information and belief, were underwritten based on the initial fixed, interest-only payment until at least the end of 2005.

99.   Countrywide marketed its hybrid ARMs by emphasizing the low monthly payment and low "fixed" initial interest rate.   This included misrepresenting or obfuscating the amount of time that the fixed rate would be in effect, misrepresenting or obfuscating the fact that the interest rates on the loans are adjustable rather than fixed, and obfuscating or misrepresenting the amount by which payments could increase once the initial fixed rate expired.

100.   The State of California investigation also indicated that Countrywide and its business partner brokers also often misrepresented or obfuscated the fact that hybrid ARMs, particularly 2/28 and 3/27 ARMs, included prepayment penalties, or falsely represented that the prepayment penalties could be waived when the borrowers refinanced with Countrywide.

101.   Countrywide and its brokers also misrepresented or obfuscated how difficult it might be for borrowers to refinance hybrid ARMs. Although borrowers often were assured that they would be able to refinance, those seeking to refinance hybrid ARMs after the expiration of the initial interest-only period likely would be unable to do so, unless the home serving as security for the mortgage had maintained or increased its value. This was particularly true for borrowers whose loans have very high loan-to-value ratios, as there would be no new equity in the borrowers' homes to help them pay fees and costs associated with the refinances, as well as any prepayment penalties that may still apply.

102.   Countrywide also deceptively marketed HELOCs, particularly to borrowers who had already obtained or were in the process of obtaining first mortgage loans from Countrywide.

103.   The State of California investigation revealed numerous problems with Countrywide's marketing of such loans.   According to the California attorney general: Countrywide referred to such loans as "piggies" or "piggyback loans," and referred to simultaneously funded first loans and HELOCs as "combo loans."   For example, with an 80/20 loan, the first loan typically covered 80% of the appraised value of the home securing the mortgage, while the HELOC covered any of the home's remaining value up to (and sometimes exceeding) 20%.   Thus, the HELOC and the first loan together often encumbered 100% or more of a home's appraised value.

104.   Because Countrywide offered HELOCs as piggybacks to pay option and hybrid ARMs, 100% or more of a property's appraised value could be encumbered with loans that required interest-only payments or allowed for negative amortization.

105.   Countrywide typically urged borrowers to draw down the full line of credit when HELOCs initially funded.   This allowed Countrywide to earn as much interest as possible on the HELOCs it kept in its portfolio, and helped generate the promised payment streams for HELOCs sold on the secondary market.   For the borrower, however, drawing down the full line of credit at funding meant that there effectively was no "equity line" available during the draw period, as the borrower would be making interest-only payments for five years.

106.   Upon the end of the draw period, the HELOC notes generally require borrowers to repay the principal and interest in fully amortizing payments over a fifteen year period.   A fully drawn HELOC was therefore functionally a 20- or 25-year closed-end mortgage.   However, Countrywide did not provide

borrowers with any documents or other materials to help them calculate the principal and interest payments that would be due after the draw, or interest-only, period.

107. Countrywide HELOCs were underwritten not to the fully amortizing payment, but to the interest-only payments due during the draw period. Countrywide typically charged an early termination fee for HELOCs closed before three years, and sometimes would charge a monthly fee for HELOCs where the balance fell below a specified amount.

108. A borrower with an interest-only or a negatively amortizing loan faces even greater payment shock if he or she also has a fully drawn HELOC; however this was typically obfuscated from or not explained to borrowers. Moreover, a borrower with a piggyback HELOC, particularly a borrower whose first mortgage negatively amortized or allowed interest-only payments, is even less likely to be able to refinance at the time of his or her payment shock unless his or her home has increased in value.

## IV.    Countrywide Eased its Underwriting Standards

109. As discussed above, Countrywide was narrowly focused on increasing its loan volume. This translated into boosting the number of loans it originated, without regard to the borrowers' ability to pay, and substantially increased the risk of borrowers losing their homes.

110. Accordingly, Countrywide relaxed and/or disregarded underwriting standards. This included the utilization of low and no-documentation loans.

111. Typically, borrowers seeking mortgage loans are required to document their ability to pay by showing proof of their income. This usually includes, for example providing W-2s or tax returns, as well as assets. Countrywide, however, disregarded such documentation requirements with respect to its riskiest loan products and introduced a variety of reduced or no

documentation loan programs that eased and quickened the loan origination process. The State of California's investigation revealed that the vast majority of the hybrid ARMs and nearly all of the pay option ARMs originated by Countrywide were reduced or no documentation loans.

112. Employment was verbally confirmed and income was supposed to be roughly consistent with incomes earned in the type of job in which the borrower was employed. Reduced documentation loans, in turn, allowed borrowers to document their income through the provision of W-2 tax forms, bank statements, or verbal verification of employment. These low- and no-documentation programs enabled Countrywide to process loans more quickly and therefore to make more loans. Stated income loans also encouraged the overstating of income – loan brokers and officers either overstated the borrower's income without his or her knowledge, or led the borrower into overstating his or her income without explaining the risk of default that the borrower would face with a loan

113. Countrywide also eased its underwriting standards by lowering the minimum requirements for certain types of loans. For instance, the Company decreased: (a) minimum requisite credit scores for stated income loans; (b) qualifying interest rates; (c) requisite loan-to-value ratios; and (d) minimum debt-to-income ratios.

114. These practices had the effect of increasing the risk that Countrywide's borrowers would be placed into mortgage loans that they could not afford to repay.

115. Countrywide also routinely encouraged the granting of exceptions from its computerized underwriting system, known as "CLUES")—thus, willfully ignoring its own minimal underwriting guidelines.

116. The CLUES system would issue a loan analysis report, based upon the proposed borrower's financial and credit information. This report would both:

(a) rate the borrower's credit and ability to repay the loan; and (b) indicate whether a proposed loan was in compliance with Countrywide's underwriting guidelines.  The CLUES system would recommend that the loan be approved, declined or referred to manual underwriting for special analysis by a Countrywide underwriter.

117.  At this point, as the State of California's investigation noted, underwriters could overcome potential rule violations or other underwriting issues flagged by CLUES by adding on "compensating factors," such as letters from the borrower that addressed a low FICO score or provided explanations regarding a bankruptcy, judgment lien, or other issues affecting credit status.  Countrywide heavily pressured its underwriters to process and fund as many loans as possible. They were expected to process 60 to 70 loans per day, making careful consideration of borrowers' financial circumstances and the suitability of the loan product for them nearly impossible.  Even if CLUES had recommended denying a loan, the underwriter could override that denial if he or she obtained approval from his or her supervisor.  Supervisors, including branch managers and regional vice presidents, were given liberal authority o grant such exceptions.

118.  As the State of California's investigation showed, it even came to a point where, rather than having to show why they were seeking an exception to Countrywide's underwriting standards, underwriters increasingly had to justify why they were *not* approving a loan or granting an exception for unmet underwriting criteria to their supervisors, as well as to dissatisfied loan officers and branch managers who earned commissions based on loan volume.

119.  In short, Countrywide granted exceptions liberally, further diluting its already minimal underwriting standards for making loans.  Exceptions were granted when one or more standards were not met, including minimum credit score, maximum loan-to-value and maximum loan amount.  Further, Countrywide

placed borrowers in risky loans such as hybrid and pay option ARMs, based on stated but not verified income and assets. The Company also readily promoted to brokers its willingness to lower underwriting standards. As the California attorney general noted, for example, Countrywide promoted "Unsurpassed Product Choices and Flexible Guidelines," including (a) "100% financing for purchase or refinancing" loans; (b) "80/20 combo loans for stated Self-Employed and Non Self-Employed;" (c) "Stated Self-Employed and Non Self-Employed loan programs with as low as a 500 credit score." Countrywide also stated that its "Specialty Lending Group's experienced and knowledgeable loan experts are empowered to review all loan packages, make sound credit decisions and provide quality lending solutions - yes, even for 'hard to close' loans."

## V.     Countrywide Engaged in Deceptive and Misleading Marketing Practices

### 1. Bait and Switch Tactics

120.    Countrywide engaged in a number of deceptive, unfair and misleading marketing practices.

121.    These included deceptive marketing campaigns, bait-and-switch tactics and fee-churning by encouraging chronic refinancing.

122.    For example, Countrywide engaged in "bait and switch" tactics in its residential loan transactions. Countrywide systematically baited customers into residential mortgage loan transactions with promises of fixed interest rates, low interest rates, low or no fees, lower monthly payments compared to then current payments, no prepayment penalties, and/or the existence or absence of particular terms. Countrywide targeted consumers for predatory, "subprime" home loans and induced borrowers to enter into unfair and deceptive residential mortgages without regard for the homeowners' interests, actual assets or ability to pay. By its

predatory loan practices, Countrywide engaged in a persistent "bait and switch" scheme through which it lures borrowers with promises of favorable interest rates, monthly payments and/or loan terms, and then often switched the terms to significantly less favorable ones.

123. When loan paperwork was presented to customers for signature at closing, the terms were often contrary to those initially promised. Due to the complexity of such paperwork, hurried closings, and improper disclosure procedures, borrowers were often unaware that the terms of the mortgage documents do not match Countrywide's prior representations.

124. This practice went hand in hand with Countrywide's aggressive and unfair sales tactics. These practices allowed Countrywide to systematically close loans that benefited the Company to the detriment and misfortune of its customers.

125. During the Class Period, Countrywide solicited borrowers by bombarding them with a barrage of advertisements, including phone, mail, and email refinance loan offers. Such advertisements promised easy debt consolidation, no or low cost closings and easy repayment terms. By way of example, the Countrywide's Full Spectrum website contained the following enticing language:

> Imagine having cash in hand and one easy payment in place of the many bills you have now. Now imagine a reduced total monthly payment. Countrywide Home Loans' Full Spectrum® Lending Division can help make this a reality.

http://www.fullspectrumlending.com/Refinance/loanoptions/debt_consolidation.asp, accessed on November 9, 2007.

126. Countrywide often targeted borrowers it knew to be in trouble—those with low incomes and those the Company knew were already having trouble

making payments or even facing foreclosure. In targeting such borrowers, Countrywide often enticed them with the promise of help and a commitment to provide the best loan possible, yet often placed them into risky pay option ARM and hybrid ARM loans, without regard to the risk that the customer would default.

127. In addition to contacting customers who were behind in their loan payments, Countrywide also solicited existing customers on other occasions, including on their annual loan "anniversaries" and shortly before a rate or payment was to reset on pay option or hybrid ARMs, without regard to whether the loan had a prepayment penalty period that had not yet expired. In doing so, as the State of California's investigation revealed, Countrywide refinanced borrowers while the prepayment penalty on their prior Countrywide loan was still in effect, often concealing the existence of the prepayment penalty. Thus, Countrywide would lure borrowers with the promise of reducing their debt, then extract as much money from them as possible, in the form of prepayment penalties and additional late charges, once the borrower began to default on the new loan.

## 2. Marketing Risky Pay Option ARM and Hybrid ARMs in a Misleading and Deceptive Manner

128. As with Plaintiff Brown, Countrywide often and readily took advantage of the complex nature of the pay option and hybrid ARMs. As noted above, Countrywide lured borrowers with the promise of reducing their debt and having lower monthly payments. Further, as discussed above, pay option ARM and hybrid ARM loans begin with lower monthly payments and interest rates than most other types of loan products. Thus, Countrywide was able to easily sell such loans to borrowers by purposefully focusing on the initial low monthly payments and/or rates and by obscuring or misrepresenting the true risks of such loans.

129. As in Plaintiff Brown's situation, Countrywide's common approach with respect to pay option ARMs was to focus the borrower's attention on the low

1  minimum payment—a payment that Countrywide knew would result in negative

2  amortization and payment shock.

3      130.  For example, when presenting a borrower with various loan options,

4  for example, Countrywide would "sell the payment" by showing the borrower

5  the minimum monthly payments for the pay option ARM in comparison to other

6  loan products with larger payments. Then, Countrywide would ask which payment

7  the borrower preferred without discussing other differences between the loan

8  products.  Naturally, in this situation, most borrowers chose the option with the

9  lowest payment, the pay option ARM, without realizing that the payment would

10  last for only a short time before it would begin to increase.

11      131.  As with Plaintiff Brown, another approach used by Countrywide was

12  to present the pay option ARM as the option, then "sell the payment" by focusing

13  the borrower's attention on how much the borrower would "save" every month by

14  making such a low payment, without discussing the payment shock and negative

15  amortization that inevitably result when borrowers make minimum payments.  It

16  also represented that the payments would last for the entire term of the loan, or

17  for some period longer than that provided for by the loan's terms.  Given the

18  complexity of pay option ARMs, such a presentation easily misled borrowers

19  regarding the long-term affordability of their loans.

20      132.  As the State of California's investigation revealed, Countrywide

21  engaged in similar deceptive representations with respect to hybrid ARMs.  For

22  example, Countrywide focused its sales presentation on the interest-only

23  payments during the initial fixed-rate period, i.e. the 2-year period on a 2/28 ARM

24  or the 3-year period on a 3/27 ARM, not on how the payment would adjust to

25  include both principal and interest after the initial fixed-rate period.  It also

26  represented that the payments would last for the entire term of the loan, or for

27  some period longer than that provided for by the loan's terms.

28

133.   When selling pay option and hybrid ARMs, Countrywide engaged in another deceptive practice – rather than selling the payment, it would sell the rate. Countrywide either focused exclusively on the initial one-month, two-year, or three-year "fixed" interest rate, for example, without discussing that the rate would reset after the initial period to a potentially much higher rate, or it represented that the initial interest rate would last for a much longer period than it actually did or for the entire term of the loan.

134.   According to the California attorney general: Countrywide's letter and e-mail solicitations, as well as telemarketing calls, also focused borrowers' attention on short-term low monthly payments.  Full Spectrum loan officers, for example, were required to memorize scripts that marketed low monthly payments by focusing (a) on the potential customer's dissatisfaction with his or her current monthly payments under his or her current mortgage loan and/or (b) on so-called "savings" that result from minimum monthly payments.  As just one of many potential examples, to overcome a borrower's claim that he or she already has a loan with a low interest rate, Countrywide required Full Spectrum loan officers to memorize the following response: "I certainly understand how important that is to you. But let me ask you something . . . . Which would you rather have, a long-term fixed payment, or a short-term one that may allow you to realize several hundred dollars a month in savings? I am able to help many of my clients lower their monthly payments and it only takes a few minutes over the phone to get started."  What the Full Spectrum loan officer did not state was that the borrowers would, in fact, not save money because the payment on the new loan would ultimately exceed the payment on the borrower's current loan.

135.   Yet another common tactic used by Countrywide was to downplay the true risk of the pay option ARM or hybrid ARM by misleading the borrower with respect to his/her ability to refinance before their rates/payments increased.

1  When the borrower asked questions, for instance, Countrywide would respond
2  that the borrower should not worry, as he or she could always simply refinance
3  and avoid any increased finance charges.

4      136.  Countrywide often represented that the value of a borrower's home
5  would increase, thus creating enough equity to obtain a loan with better terms.
6  However, borrowers with interest-only or negatively amortizing loans that
7  encumbered as much as, if not more than, 100% of their home's appraised value,
8  were highly unlikely to be able to refinance into another loan if their home did not
9  increase in value.   Additionally, any consumers who sought to refinance a
10 Countrywide mortgage would likely incur a substantial prepayment penalty, thus
11 limiting their ability to obtain a more favorable loan.

12     137.  Countrywide loan officers often misrepresented or obfuscated the fact
13 that a borrower's loan had a prepayment penalty or misrepresented that a
14 prepayment penalty could be waived.  Countrywide also promised borrowers that
15 they would have no problem refinancing their pay option or hybrid ARMs, when in
16 fact they might have difficulty refinancing due to the existence of prepayment
17 penalties. Prepayment penalties on pay option and hybrid ARMs essentially
18 prevent many borrowers from refinancing such unaffordable loans before their
19 payments explode or rates reset.

20     138.  Countrywide did everything within its power to take advantage of
21 unsophisticated borrowers.   The Company knew that borrowers subjected to any
22 of the deceptive marketing practices described above would not understand the true
23 risks and likely unaffordability of their loans.  For example, a common tactic, used
24 with each of the named Plaintiffs, was to require borrowers sign a large stack of
25 documents without providing the borrower with time to read them.

26     139.  Many borrowers have complained regarding Countrywide's practices.
27 The State of California found that Countrywide received numerous complaints

28

1   regarding these practices from consumers.  Many borrowers complained that
2   they did not understand the terms of their pay option and hybrid ARMs, including
3   the potential magnitude of changes to their monthly payments, interest rates,
4   or loan balances.  Many borrowers also complained that Countrywide's loan
5   officers either simply did not tell them about the payment or rate increases on
6   such loans or promised that they would have fixed-rate, fixed payment loans,
7   rather than adjustable rate mortgage loans with increasing payments.

8       140.  However, despite having knowledge of these complaints,
9   Countrywide continued on its course.  Its narrow focus was on increasing its loan
10  volume at any cost—without regard to the impact upon its customers.

11  **VI.  Countrywide Purposefully Incentivized its Employees and Brokers to
12       Close as Many Loans as Possible and to Close as Many High-Priced,
13       Risky Loans as Possible, Without Regard to Borrowers' Ability to
14       Repay**

15      141.  Countrywide intentionally trained its sales force to seduce customers
16  into bad loans by placing them at ease.  Countrywide boasted that it would provide
17  the borrower with "the best loan possible."  Once the employee gained the
18  customer's trust, however, he/she would often led the borrower to high-cost, risky
19  loans that resulted in richer commissions for Countrywide's employees and larger
20  fees for Countrywide.

21      142.  Countrywide utilized numerous sales and solicitation tactics, designed
22  to lure customers into unsuitable, unfair and unreasonable loans.  As described
23  herein, the Company's mission was to maximize its own profits at any cost—
24  regardless of the impact upon its customers.  In furtherance of this—and as
25  evidence thereof—Countrywide provided highly lucrative incentives to its
26  employees for aggressively engaging in often misleading and deceptive sales
27  practices.

28

143.   Former employees of Countrywide have stated that the Company's commission structure rewarded sales representatives for making risky, high-cost loans.  For example, according to an anonymous mortgage sales representative affiliated with Countrywide, who spoke with the New York Times, adding a three-year prepayment penalty to a loan would generate an extra 1 percent of the loan's value in a commission.  While mortgage brokers' commissions would vary on loans that reset after a short period with a low teaser rate, the higher the rate at reset, the greater the commission earned.  One former sales representative stated, "The whole commission structure in both prime and subprime was designed to reward salespeople for pushing whatever programs Countrywide made the most money on in the secondary market," the former sales representative said.  Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. Times, August 26, 2007, *available at:*

http://www.nytimes.com/2007/08/26/business/yourmoney/26country.html (article hereinafter referred to as "Lending Spree").

144.   Countrywide not only permitted, but actually *encouraged* its sales force to make high risk, high cost loans—regardless of suitability to the customer or the fact that a customer should qualify for a lower-cost loan.  The Company intentionally designed its compensation system in such a manner as to reward sales representatives and mortgage brokers for steering customers into higher-cost loans than those for which they qualified. For example:

> The Company's incentive system also encouraged brokers and sales representatives to move borrowers into the subprime category, even if their financial position meant that they belonged higher up the loan spectrum. Brokers who peddled subprime loans received commissions of 0.50 percent of the loan's value, versus

0.20 percent on loans one step up the quality ladder,
known as Alternate-A, former brokers said.

*Lending Spree.*

145. Countrywide specifically trained its employees to push often unsuitable loan products upon customers and to aggressively overcome the objections of prospective customers:

> One marketing manual used in Countrywide's subprime unit during 2005, for example, walks sales representatives through the steps of a successful call. "Step 3, Borrower Information, is where the Account Executive gets on the Oasis of Rapport," the manual states. "The Oasis of Rapport is the time spent with the client building rapport and gathering information. At this point in the sales cycle, rates, points, and fees are not discussed. The immediate objective is for the Account Executive to get to know the client and look for points of common interest. Use first names with clients as it facilitates a friendly, helpful tone."

If clients proved to be uninterested, the script provided ways for sales representatives to be more persuasive. Account executives encountering prospective customers who said their mortgage had been paid off, for instance, were advised to ask about a home equity loan. "Don't you want the equity in your home to work for you?" the script said. "You can use your equity for your advantage and pay bills or get cash out. How does that sound?"

*Lending Spree.*

146. Countrywide's high-pressure sales environment and compensation system encouraged serial refinancing of Countrywide loans, without regard to a

1  borrower's ability to repay, and with the consequence of draining equity from
2  borrowers' homes.

3      147.   Countrywide management at all levels pressured the employees below
4  them to sell and approve more loans, at the highest prices, as quickly as possible, in
5  order to maximize Countrywide's profits on the secondary market.  For instance,
6  the State of California's investigation found that at least one Countrywide
7  executive: (a) monitored Countrywide's loan production numbers and pressured
8  employees involved in selling loans or supervising them to produce an ever-
9  increasing numbers of loans, faster; and (b) pressured underwriters to increase their
10  loan production and to increase approval rates by relaxing underwriting criteria.
11  Further, regional vice presidents pressured branch managers to increase their
12  branches' loan numbers.  Branch managers pressured loan officers to produce
13  more loans, faster, and often set their own branch-level production quotas.
14  Further, Countrywide required underwriters to meet loan processing quotas and
15  paid bonuses to underwriters who exceeded them.

16      148.   The State of California also found that customer service
17  representatives at Countrywide's Call Center were expected to achieve quotas and
18  received bonuses for exceeding them.     Countrywide required service
19  representatives to complete calls in three minutes or less, and to complete as many
20  as sixty-five to eighty-five calls per day.  Although three minutes is not sufficient
21  time to assist the confused or distressed borrowers who contacted them,
22  Countrywide required service representatives to market refinance loans or
23  piggyback HELOCs to borrowers who called with questions including borrowers
24  who were behind on their monthly payments or facing foreclosure.  Using a script,
25  the service representatives were required to pitch the loan and transfer the caller to
26  the appropriate Countrywide division.    Service representatives also received
27  bonuses for loans that were so referred and funded.

28

CLASS ACTION COMPLAINT

149. Essentially, Countrywide placed intense pressure upon its employees and brokers to sell products that, although risky and harmful for borrowers, increased Countrywide's profits on the secondary market.

150. Countrywide also made arrangements with a large network of mortgage brokers to procure loans for Countrywide and, through its loan pricing structure, encouraged these brokers to place homeowners in loans with interest rates higher than those for which they qualified, as well as prepayment penalty obligations. This system of compensation aided and abetted brokers in breaching their fiduciary duties to borrowers by inducing borrowers to accept unfavorable loan terms without full disclosure of the borrowers' options and also compensated brokers beyond the reasonable value of the brokerage services they rendered.

## VIII. Numerous Borrowers Have Complained About Countrywide's Practices

151. Plaintiffs are far from alone. Numerous frustrated consumers have posted complaints on the internet, through various consumer complaint websites, describing their own experiences. For instance, the following small sampling of complaints have been posted on a popular consumer Internet site, purportedly by disgruntled Countrywide customers:

**\*\*\*\*\* of Haverhill MA (09/24/07)**

I just pulled our <u>loan application</u> from the closing and it states my husband makes $15,000 a month!! We never ever told them that....someone fudged the numbers to make the loan work, and now it has finally caught up....our combined monthly income is only $5,000!! we are in so much debt we can't afford to make payments. I have all documentation...we did not sign the prelimary [sic] docs.

**\*\*\*\*\* of Pico Rivera CA (08/14/07)**

i have a ARM loan with a PMI. My payment went from 1857.41 to 2.022.22 per month. I bring home 1896.00 per month, this does not include my other bills.  I called countrywide if they could work out a plan to lower my payment, they said yes but since jun [sic] 14, 2007 they still have not worked out a plan.

***** of Tampa FL (08/11/07)

I am a current Countrywide customer with an <u>adjustable rate mortgage</u> that I was looking to refinance to a fixed rate.  I see advertised online no closing costs and I figure since I'm a current customer that would be great and that they would take care of me. Boy was I wrong about that!! After almost two months of haggling with them they finally give me a 'bottom line quote which was a savings of nineteen cents per month!!  Then when I looked at the contract they were charging me over 7,000 in early termination fees how can you do that when you're refinancing with the SAME Company? You're not terminating, your [sic] extending your loan.

The total refinance amount they gave me was 220,500. They would not explain to me what the additional fees were for and added that they would not give me any cash out to make any home improvements.   I ended up escalating this complaint up to their CEO.  I still haven't gotten a straight answer out of anyone and I'm very upset and frustrated.

***** of Staten Island NY (08/08/07)

CLASS ACTION COMPLAINT

Countrywide lied to me about my loan. They gave me a loan with different payment options. My house is now in foreclosure.

**\*\*\*\*\* of Foothill Ranch CA (05/24/07)**

We moved from PA to CA in 2005. We were offered a 1% rate by Countrywide, yeah right! The rate is actually 8%. The loan offers you 4 payment options. We did the lowest one not knowing it was a neg am loan if we did that. We've lost most of our down payment due to the neg am. By the time I began reviewing the statements thoroughly, it was too late to pay the higher payments because they've increased due to the principle increasing. We cannot refi without paying a penalty and further the housing market values are currently suffering. In addition after making my payments for the first year - all interest, my year end mortgage interest payments did not equal their tax statement. I made several inquiries only to be told that THEY ARE RIGHT AND I AM WRONG.

**\*\*\*\*\* of Lakewood CA (05/08/07)**

I am glad that there are places like this that consumers can voice their concerns about Businesses that take advantage of consumers. Countrywide had called me when I was behind in my payment due to wage garnishment for medical bills when My wife had a baby three months early due to complication. Countrywide had the answer they would refinance my house and get me money pay the medical bills pay off my car pay the

CLASS ACTION COMPLAINT

back taxes pay the back payments and lower my payment. Well they took money out and put in escrow to pay the taxes and insurance but that money vaporised [sic].

I refinacned [sic] from Countrywide to Countrywide from a 30 year fixed to a two year fixed then arm. And it cost me $ 28000.00 to do this and they said that do to my economic situation it was the best thing for me to do. Now looking back on it it was good for them. Now they have me locked into a prepayment penalty loan...

***** of Sun City AZ (03/03/07)

I asked for a refinance to get out of a negative amortization loan. I asked for a fixed rate program as i was converting the house into a rental. During the refinance, I was never able to get a hold of the agent and he never returned any phone calls. He told me i was in a program that was a fixed payment and rate for the following year. I signed the documents, and after 3 months the payment changed to a negative amortization loan. I proceeded to contact the agent, of which he said there was a mistake in the loan and it shouldn't be a NEGAM. He promised me he would get it fixed and he would call me with all the details. He promised he would have it fixed before my next payment. I never heard back from him and he never returned a phone call or email again. Now i am stuck in the same loan program i

attempted to refinance out of with a higher balance due to refinancing costs

***** **of Delray Beach FL (11/15/05)**

I believe I have been fraudulently charged excessive and/or unjustified fees in conjunction with a loan modification executed in Sept. 04. After reams of letters to Countrywide requesting a line-by-line breakdown and justification of all fees charged me, Countrywide has STILL NOT, after over a year, provided me with this information, to which I am legally entitled. Their continued refusal and/or inability to provide me with this information only leads me to believe that there were improprieties involved in this transaction. I want to file a complaint with the appropriate government agency(s) and have this investigated, but I don't know which agency(s) has jurisdiction over mortgage companies/banks.

***** **of San Antonio TX (05/14/05)**

In short, FULL SPECTRUM LENDING (division of Countrywide) pre-approved us for a 100% LTV loan (after receiving and verifying our info) only to change that and the interest rate at the last minute before closing. They knew we were over a barrel and needed to close, so they took advantage of us. We should have walked away but didn't. They also stuck us with a fat prepayment penalty, hidden way down in the fine print during closing…

CLASS ACTION COMPLAINT

**Source:**    http://www.consumeraffairs.com/finance/countrywide_mortgage.html, accessed on September 28, 2007.

152.   Plaintiffs and the Class have suffered damages as a result of Countrywide's conduct.   The experiences of Plaintiffs and the Class stem from common course of conduct in which Countrywide engaged.   Plaintiffs and the Class have been injured by Countrywide's conduct and seek redress, as described herein.

**FIRST CASE OF ACTION**
**(Unfair, Unlawful, and Deceptive**
**Business Acts and/or Practices in Violation of**
**California Business & Professions Code §§ 17200 *et seq.*)**

153.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

154.   Countrywide's operations are based in California.   The unlawful, unfair and fraudulent business practices described herein emanated from California.

155.   All of the conduct alleged herein occurred in California by virtue of the Company's centralized business practices or stemmed from policies and procedures that originated from and were controlled by Countrywide's home offices in California.

156.   California Business & Professions Code §§ 17200 et seq. prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

157.   Throughout the Class Period, Countrywide engaged in unlawful, unfair or fraudulent business acts and practices in violation of California Business & Professions Code §§ 17200, et seq., in that: (a) Countrywide's practices and conduct are immoral, unethical, oppressive and substantially harmful to Plaintiffs and the members of the Class; (b) the justification for Countrywide's practices and

- 43 -
CLASS ACTION COMPLAINT

conduct outweighed by the gravity of the injury to Plaintiffs and the Class; and (c) Countrywide's practices constitute unfair, fraudulent, untrue or misleading actions in that such conduct is likely to deceive members of the public.

158.   Countrywide's unlawful, unfair, and/or fraudulent business practices are described herein and include, without limitation:

(a)   luring customers with false promises of low-cost mortgage loans;

(b)   charging unnecessary and/or exorbitant fees;

(c)   steering customers into high-cost cost loans with exorbitant fees and finance charges;

(d)   misrepresenting, concealing or failing to adequately disclose material loan terms, including, without limitation, the disclosure of the risks and ramifications of pay option ARMs and hybrid ARMs;

(e)   creating a scheme to increase loan volume at any cost, without regard to the borrowers' ability to repay;

(f)   concealing the existence and length of unfair and/or punitive prepayment penalty provisions;

(g)   making untrue or misleading representations regarding borrowers' ability to refinance their loans; and

(h)   utilizing unfair and/or punitive prepayment penalty provisions to discourage and/or prevent borrowers from refinancing their loans at lower rates with its competitors.

159.   The foregoing acts and practices are also unfair and/or fraudulent within the meaning of § 17200 in that they are likely to mislead the public as to:

(a)   the nature of the mortgage loans available to them;

(b)   the true risks associated with the mortgage loans that they received;

(c)   the true nature of the "assistance" of Countrywide's employees and agents, as such employees and agents were not actually assisting the

1    customer, but, rather, were incentivized to steer the customer into the

2    high cost loans that increase profits for Countrywide, to the

3    customer's detriment; and

4    (d)    the true costs of the loans that they received, including, without

5    limitation, increasing monthly payments and cost-prohibitive

6    prepayment penalties.

7    160.   The foregoing acts and practices have caused substantial harm to the

8 Plaintiffs, and the members of the Class. Plaintiffs have suffered injuries in fact

9 and have lost money or property as a result of Countrywide's conduct.

10    161.   By reason of the foregoing, Countrywide should be required to pay

11 damages in an amount to be proven at trial, disgorge their illicit profits and/or

12 make restitution to the Plaintiffs, the general public, and the members of the Class,

13 and/or be enjoined from continuing in such practices pursuant to §§ 17203 and

14 17204 of the California Business & Professions Code.

15                          **SECOND CAUSE OF ACTION**

16    **(Violation of California Business & Professions Code §§ 17500 *et seq.*)**

17    162.   Plaintiffs hereby incorporate by reference the allegations contained in

18 all preceding paragraphs.

19    163.   Countrywide's operations are based in California. The false and/or

20 misleading statements and advertising described herein emanated from California

21 and were directed toward consumers both within and outside of California.

22    164.   All of the conduct alleged herein occurred in California by virtue of

23 the Company's centralized business practices or stemmed from policies and

24 procedures that originated from and were controlled by Countrywide's home

25 offices in California.

26    165.   Defendants have violated and continue to violate Business and

27 Professions Code section 17500 by making or disseminating untrue or misleading

28

statements, or by causing untrue or misleading statements to be made or disseminated, in or from California, with the intent to induce members of the public to enter into mortgage loan or home equity line of credit transactions secured by their primary residences.  These untrue and misleading statements include, without limitation:

(a)     statements that borrowers would receive low-cost mortgage loans;

(b)     statements that borrowers would lower their debt obligations by refinancing with Countrywide;

(c)     statement that grossly underrepresented the true nature of the risk associated with Countrywide's adjustable rate mortgage loans, including statements that the initial payment rate was the interest rate, statements regarding the duration of the initial payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans;

(d)     statements that borrowers with pay option and hybrid ARMs offered by Countrywide would be able to refinance the mortgage loans before the interest rates reset, when in fact they most likely could not;

(e)     statements regarding prepayment penalties on pay option and hybrid ARMs offered by Countrywide, including statements that the mortgage loans did not have prepayment penalties, when in fact they did, and statements that prepayment penalties could be waived, when in fact they could not;

(f)     statements regarding the risks and costs of reduced or no documentation mortgage loans with terms that borrowers could not actually afford;

166.   Defendants knew, or by the exercise of reasonable care should have known, that these statements were untrue or misleading at the time they were made and that members of the public were likely to be deceived.

167.   The foregoing conduct has caused substantial harm to the Plaintiffs, and the members of the Class.  Plaintiffs and the Class have suffered injuries in fact and have lost money or property as a result of Countrywide's conduct, up to and including, without limitation:

1)   paying excessive finance charges in the forms of increased interest rates;

2)   experiencing payment shock;

3)   experiencing negative amortization;

4)   being forced to continue to pay excessive home finance charges, by way of being unable to refinance; and

5)   paying prepayment penalties.

168.   By reason of the foregoing, Countrywide should be required to disgorge its ill-obtained profits and/or make restitution full to the Plaintiffs, the general public, and the members of the Class.

### THIRD CAUSE OF ACTION
#### (Unfair or Deceptive Acts or Practices in Violation of California Civil Code §§ 1750 et seq.)

169.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

170.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

171.   Countrywide operations are based in California.  The unfair and/or deceptive acts and practices described herein emanated from California.

172.   All of the conduct alleged herein occurred in California by virtue of the Company's centralized business practices or stemmed from policies and procedures that originated from and were controlled by Countrywide's home offices in California.

173.   By its wrongful conduct as alleged herein, Countrywide has created, engaged in and/or participated in unfair practices, in violation of the Consumers Legal Remedies Act, California Civil Code sections 1750 *et seq.*

174.   Countrywide has engaged in unfair or deceptive acts or practices intended to result in the sale of their goods and services in violation of California Civil Code §§1750 *et seq.*, including but not limited to: (a) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, characteristics, status, affiliation, or connection which he or she does not have, in violation of section 1770(a)(5); and (b) that a transaction confers or invokes rights, remedies, or obligations which it does not have or involve, or which are prohibited by law, in violation of section 1770(a)(14); and (c) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, in violation of section 1770(a)(16).

175.   As a proximate result of Countrywide's violations of the CLRA, Plaintiffs and the Class have suffered damages and, pursuant to §§ 1780 and 1782(d), Plaintiffs and members of the Class seek to enjoin the methods, acts and practices described herein.

176.   The actions described above constitute unlawful, unfair and/or defective acts or practices within the meaning of the Consumer Legal Remedies Act. The Plaintiffs and the Class Members are entitled an order enjoining Countrywide from engaging in the unlawful acts and practices described herein,

1 together with costs, attorney's fees and any other relief which the Court deems
2 proper.

### FOURTH CAUSE OF ACTION
### (Unjust Enrichment/Disgorgement of Profits)

177. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

178. Countrywide has unjustly enriched itself at the expense of Plaintiffs and the Class and, accordingly, should not be permitted to take advantage of its wrong.

179. Further, Countrywide has acted in conscious disregard of the rights of Plaintiffs and the Class and should be required to surrender all money obtained through its unfair practices.

180. Thus, Countrywide should be required to make restitution of property and/or benefits received, retained, or appropriated.

### FIFTH CAUSE OF ACTION
### (Declaratory and Injunctive Relief)

181. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

182. On each cause of action stated above, Plaintiffs and the Class will be irreparably injured in the future by the Defendants' misconduct.

183. Plaintiffs, on behalf of themselves and all Class members, seek a judgment declaring that the Defendants must cease the activities described herein, provide Class Members with adequate remedies, including, without limitation, rescission of their loans and/or refunds of unjustified, artificially inflated finance charges, and provide for adequate procedures and policies for the immediate and complete refund and/or cancellation of prepayment penalties.

184. To the extent that Plaintiffs and the Class members do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of the Defendants' misconduct unless injunctive and declaratory relief is granted.

185. By reason of the foregoing, Plaintiffs and the Class members are entitled to declaratory and injunctive relief as set forth herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all members of the Class and the Class, request judgment and relief as follows:

(a)   Certification of this case as a Class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class, as well as appointing Plaintiffs' counsel as counsel for the Class;

(b)   That the Court declare, adjudge and decree that Countrywide has committed the violations of law alleged herein;

(c)   That Countrywide be enjoined from continuing the illegal course of conduct alleged herein;

(d)   That the Court award damages, as set forth herein, to Plaintiffs and the Class, in an amount to be determined at trial;

(e)   That the Court order disgorgement of Countrywide's ill-gotten gains and/or impose a constructive trust upon all such ill-gotten gains and award Plaintiffs and the Class full restitution of all monies wrongfully acquired by Countrywide;

(f)   That Plaintiffs and the Class be granted such other, further and different relief that is necessary to remedy the continuing harm caused by and prevent the recurrence of Countrywide's unlawful conduct described herein; and

(g)     That the Court award Plaintiffs their attorneys' fees, costs and prejudgment interest and such other relief as the Court may deem just and proper.

Dated: July 17, 2008

LIM RUGER & KIM, LLP

By: _____

Christopher Kim
George Busu
1055 West Seventh Street, Suite 2800
Los Angeles, California 90017
Telephone: (213) 955-9500

**SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA   19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs*

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury for all claims so triable.

Dated: July 17, 2008

LIM RUGER & KIM, LLP

By: _____
Christopher Kim
George Busu
1055 West Seventh Street, Suite 2800
Los Angeles, California 90017
Telephone: (213) 955-9500

**SCHIFFRIN BARROWAY TOPAZ
& KESSLER, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA   19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV08- 787 DOC (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=====================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

Christopher Kim (Bar No. 082080)
George Busu (Bar No. 235993)
LIM RUGER & KIM, LLP
1055 West Seventh Street, Suite 2800
Los Angeles, California 90017
Telephone: (213) 955-9500

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYMONE LEYVAS (see the attached list for additional plaintiffs) <br><br> PLAINTIFF(S) <br> v. <br> BANK OF AMERICA CORP. (see the attached list for additional defendants) <br><br> DEFENDANT(S). | CASE NUMBER <br><br> SACV08-787 DOC MLGx <br><br><br> **SUMMONS** |

TO:    DEFENDANT(S):  <u>Bank of America Corp. (See the attached list for additional defendants)</u>

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney,  <u>Christopher Kim or George Busu</u> , whose address is <u>Lim, Ruger & Kim, LLP, 1055 West Seventh Street, Suite 2800, Los Angeles, CA 90017</u> .  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: **JUL 1 7** 2008

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    **SUMMONS**

# ATTACHMENT TO SUMMONS (CV-01A)

## Additional Plaintiffs

JOHN LEYVAS and JUNE HARDING BROWN, on behalf of themselves
and all others similarly situated,

## Additional Defendants

COUNTRYWIDE FINANCIAL CORP., COUNTRYWIDE HOME
LOANS, INC., COUNTRYWIDE BANK, FSB, FULL SPECTRUM
LENDING, INC. and DOES 1-10   inclusive,

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself □)<br>SYMONE LEYVAS, JOHN LEYVAS and JUNE HARDING BROWN, on<br>behalf of themselves and all others similarly situated, | **DEFENDANTS**<br>BANK OF AMERICA CORP., COUNTRYWIDE FINANCIAL CORP.,<br>COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE BANK, FSB,<br>FULL SPECTRUM LENDING, INC. and DOES 1-10, inclusive, |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing<br>yourself, provide same.)<br><br>Christopher Kim/George Busu           Tel: (213) 955-9500<br>LIM RUGER & KIM, LLP<br>1055 West Seventh St., Suite 2800, Los Angeles, CA 90017 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

□ 1 U.S. Government Plaintiff    ☑ 3 Federal Question (U.S.
                                      Government Not a Party)

□ 2 U.S. Government Defendant    □ 4 Diversity (Indicate Citizenship
                                      of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | □ 1 | □ 1 | Incorporated or Principal Place<br>of Business in this State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place<br>of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original     □ 2 Removed from    □ 3 Remanded from    □ 4 Reinstated or    □ 5 Transferred from another district (specify):    □ 6 Multi-    □ 7 Appeal to District
Proceeding          State Court         Appellate Court       Reopened                                                       District      Judge from
                                                                                                                            Litigation    Magistrate Judge

**V. REQUESTED IN COMPLAINT:    JURY DEMAND:** ☑ Yes  □ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  □ No         □ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Jurisdiction: 28 U.S.C. § 1332(d) & Cause of Action: Fed. R. Civ. P. 23(a), (b)(2), and/or (b)(3)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL<br>PROPERTY | PRISONER<br>PETITIONS | LABOR |
|---|---|---|---|---|---|
| □ 400 State Reapportionment | □ 110 Insurance | □ 310 Airplane | □ 370 Other Fraud | □ 510 Motions to | □ 710 Fair Labor Standards |
| □ 410 Antitrust | □ 120 Marine | □ 315 Airplane Product | □ 371 Truth in Lending | Vacate Sentence | Act |
| □ 430 Banks and Banking | □ 130 Miller Act | Liability | □ 380 Other Personal | Habeas Corpus | □ 720 Labor/Mgmt. |
| □ 450 Commerce/ICC | □ 140 Negotiable Instrument | □ 320 Assault, Libel & | Property Damage | □ 530 General | Relations |
| Rates/etc. | □ 150 Recovery of | Slander | □ 385 Property Damage | □ 535 Death Penalty | □ 730 Labor/Mgmt. |
| □ 460 Deportation | Overpayment & | □ 330 Fed. Employers' | Product Liability | □ 540 Mandamus/ | Reporting & |
| □ 470 Racketeer Influenced | Enforcement of | Liability | **BANKRUPTCY** | Other | Disclosure Act |
| and Corrupt | Judgment | □ 340 Marine | □ 422 Appeal 28 USC | □ 550 Civil Rights | □ 740 Railway Labor Act |
| Organizations | □ 151 Medicare Act | □ 345 Marine Product | 158 | □ 555 Prison Condition | □ 790 Other Labor |
| ☑ 480 Consumer Credit | □ 152 Recovery of Defaulted | Liability | □ 423 Withdrawal 28 | **FORFEITURE /** | Litigation |
| □ 490 Cable/Sat TV | Student Loan (Excl. | □ 350 Motor Vehicle | USC 157 | **PENALTY** | □ 791 Empl. Ret. Inc. |
| □ 810 Selective Service | Veterans) | □ 355 Motor Vehicle | **CIVIL RIGHTS** | □ 610 Agriculture | Security Act |
| □ 850 Securities/Commodities/ | □ 153 Recovery of | Product Liability | □ 441 Voting | □ 620 Other Food & | **PROPERTY RIGHTS** |
| Exchange | Overpayment of | □ 360 Other Personal | □ 442 Employment | Drug | □ 820 Copyrights |
| □ 875 Customer Challenge 12 | Veteran's Benefits | Injury | □ 443 Housing/Acco- | □ 625 Drug Related | □ 830 Patent |
| USC 3410 | □ 160 Stockholders' Suits | □ 362 Personal Injury- | mmodations | Seizure of | □ 840 Trademark |
| □ 890 Other Statutory Actions | □ 190 Other Contract | Med Malpractice | □ 444 Welfare | Property 21 USC | **SOCIAL SECURITY** |
| □ 891 Agricultural Act | □ 195 Contract Product | □ 365 Personal Injury- | □ 445 American with | 881 | □ 861 HIA (1395ff) |
| □ 892 Economic Stabilization | Liability | Product Liability | Disabilities - | □ 630 Liquor Laws | □ 862 Black Lung (923) |
| Act | □ 196 Franchise | □ 368 Asbestos Personal | Employment | □ 640 R.R. & Truck | □ 863 DIWC/DIWW |
| □ 893 Environmental Matters | **REAL PROPERTY** | Injury Product | □ 446 American with | □ 650 Airline Regs | (405(g)) |
| □ 894 Energy Allocation Act | □ 210 Land Condemnation | Liability | Disabilities - | □ 660 Occupational | □ 864 SSID Title XVI |
| □ 895 Freedom of Info. Act | □ 220 Foreclosure | **IMMIGRATION** | Other | Safety /Health | □ 865 RSI (405(g)) |
| □ 900 Appeal of Fee Determi- | □ 230 Rent Lease & Ejectment | □ 462 Naturalization | □ 440 Other Civil | □ 690 Other | **FEDERAL TAX SUITS** |
| nation Under Equal | □ 240 Torts to Land | Application | Rights | | □ 870 Taxes (U.S. Plaintiff |
| Access to Justice | □ 245 Tort Product Liability | □ 463 Habeas Corpus- | | | or Defendant) |
| □ 950 Constitutionality of | □ 290 All Other Real Property | Alien Detainee | | | □ 871 IRS-Third Party 26 |
| State Statutes | | □ 465 Other Immigration | | | USC 7609 |
| | | Actions | | | |

**FOR OFFICE USE ONLY:**    Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

SACV08-787

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
#### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s):  Sizemore v. Countrywide Financial, C.D. Cal. 07-cv-06094

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
        ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
        ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
        ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| SYMONE LEYVAS | Orange |
| JOHN LEYVAS | Orange |
| JUNE HARDING BROWN | Outside California--Pennsylvania |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| BANK OF AMERICA CORP. | Outside California--North Carolina |
| COUNTRYWIDE entities and FULL SPECTRUM LENDING | Los Angeles |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
    Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Christopher Kim_ Date July 17, 2008

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |